Opinion of the court delivered by
Judge Whyte.
This is an appeal from the court ol equity of the fifth circuit, held at Charlotte. The interlocutory decree, amongst other things, states that in the year 1793, a grant for 640 acres of land, in Dickson county, issued to Alexander' Nelson; that he died on the 21st August 1798, leaving' Robert Nelson, the plaintifij his son and heir, then four-teen months old, a citizen of Georgia, where his father lived at the time of his death. That the defendants, Allen and Harris, purchased the land from Outlaw who purchased from Hickman and Searcy, who purchased at' Sheriff’s sale under a decree of the county court of Davidson county, rendered in 1801, purporting to have been' made in favor of said Hickman as administrator of the deceased, Alexander Nelson, under the act of Assembly' of 1789, ch. 39, which decree was, afterwards, for want' of jurisdiction in the court to make the same, hcld-invsw lid and a nullity, upon an action of ejectment brought by the plaintiff, Robert Nelson against these defendants, to recover possession of the premises, which ejectment ivas brought the Stlf of July, 1818. Judgment was rendered in favor of the plaintiff in the circuit court, and upon appeal in error by the defendants, the judgment of the circuit court was affirmed, at the March term 1820 of the supreme court, for the 5th judicial circuit.
The defendants in this ejectment in the circuit court gave notice of claim for improvements; and on the trial, the jury found their value to be $1400.
The present suit was brought in January, 1821, by the plaintiff, Its.object is,'an account of the rents and profits; a discovery of the length of time of the defendants' *362 its commencement and continuation; its general rent and profit, with the data to found this upon, as also the number of acres cleared each jrear, respective!}'', by each of the defendants, with the value &c. and that the aggregate of this product may be s'étoff against the amount of improvements, and also his costs and charges in and about the recovery of said land, submitting to pay the balance, if any, against him, and praying an injunction to the extent of his account — and, if a balance in his favor, that it maybe decreed to him.
The answer gives the discovery required — they say they were living on the land six years and ten months before they were apprised that the complainant or any other person set up claim thereto: and they set forth the quantity of land, cleared each year, respectively, by each of them, which by an agreement between them and the plaintiff, is of the value of two dollars per acre, each and every year. They further answer, that after the final determination of the ejectment, they were always willing to deliver up possession, on payment of the amount of the improvements, after making deduction for the rents to which complainant was entitled, and frequently offered so to do; but were told, if they did not go off the land, they should'not have execution of their judgment for improvements. They then made application to this court for execution, but were told they were not entitled to execution, but were authorized to hold the land until the improvements were paid for. They now submit to this court, whether, they are liable for rents while they are compelled to hold the lands as a security for the money assessed for improvements ; and whether they are bound for any profits accruing before the commencement of the action of ejectment; or for rents and profits accruing more than three years before bringing the bill, or more than three years before bringing the ejectment. The interlocutory decree then orders the defendants to account before the clerk and master for the rents of the land for the years 1818, ’19, ’20 and ’21, at the rate of two dollars per acre for all the cleared land; and that the amount of the rents, when *363 ascertained with the interest thereon, be deducted from the $1400 for improvements; and that so much of the $1400 as is covered by the rents, be perpetually enjoined; and that the complainant, by paying the residue into the hands of the clerk and master of the supreme court, or to the defendants in the bill, be entitled to the possession.
The final decree then states, that the cause, coming on to be heard, upon the report of the clerk and master, and the decretal order, and it appearing from the report, that the complainant is entitled to the sum of $690 20 for his rents, for the years 1818, ’19, ’20 and ’21, and interest; that the assessment of $1400 for improvements, with interest thereon up to the 1st of January, 1823, amounts to the sum of $1722, which, by deducting therefrom,'! the amount of $690 20 for rents, leaves a balance for the improvements, on the 1st of January, 1823, of $1031 80, due by complainant to defendants. It is, therefore, ordered, adjudged and decreed, that all the said sum of $1400, for the improvements heretofore adjudged to the defendants in the Circuit Court of Dickson county, be perpetually enjoined, except the sum of $1031 80, with interest thereon from the first of January, 1823; and that the defendants pay the costs,and that execution issue therefor.
The Master’s report directed by the interlocutory decree, states the account of the rents from the time the defendants took possession, and cleared and cultivated the land, (viz.) the year 1812, and continues it down to the year 1821, inclusive — making the aggregate for that period, due from the defendant, Allen, amount to $591 29, and from the defendant, Harris, $631 32, being in the whole $1272 56, which deducted from the improvements, $1400, and the interest thereon, amounting to $322, to the 1st of January, 1823, being three years and ten months, and making an aggregate of $1722, leaves a balance in favor of the defendants of $449 44.
On the argument of this appeal, the principal question agitated, has been the quantum of mesne profits for which the defendants shall be liable, — their counsel admitting, in *364 the general, a liability to some extent, either from the filing of the bill, or, at the most, from the commencement of the action of ejectment, availing themselves, however, of the latitude of examination given upon appeals in chancery cases by the act of 1819, ch. 31, 18522, ch. 14, sec. 7. They have cited Leffand’s case 11, Co. 51. Hobart 98. 7 Term Hep. 727; and 9 Mass. 534, to show that the defendants, under the circumstances of their possession, are not liable at all to pay any mesne profits.— Hobart 98, says: if A were disseised by B, and B enfeoff-ed C, or were disseised by him, A had no remedy for damages against the feoffee or disseisor of his, A’s. dissei-sor, but might bring his assise against B, who was the immediate disseisor, and therein he was to recover the mesne profits by way of damage, not only for his own time, but also for the profits received by the feoffee or 2d disseisor; and if A had re-entered by which he lost his assise, he might, by action of trespass, brought against liis disseisor B, recover the mesne profits for all the mesne possessions, but not against the feoffee or lessee of said disseisor, and that C doth no wrong to charge the first disseisor lor the profits not received by him; for he, the first disseisor, was supposed to have received satisfaction at the hands of his feofice or lessee; and so paid but what he had received.
Upon this authority the argument is, that as these defendant's did not commit the original or first wrong and injury to the plaintiff’s property and possession, but are mero strangers who derived from the first wrong doer, Hickman, they are liable for their own intermediate wrongful possession against the plaintiff, and portion of the profits from the commencement of their possession in 1812 and downwards.
The first answer to this case is, the doubtfulness of its authority, for there are cases the other way, as Holcombe vs. Rawlyns, Hobart 75. Cro. Eliz. 540. The defendant was the lessee of the disseisor of the plaintiff, and the defence set up by the defendant was, that he was in, by title under the 'disseisor or wrong doer, and that he *365 should not he punished by plaintiff for occupying the land, for he was not a trespasser unto him, the plaintiff.— But the court decided and say: that by re-entry of the disseisee, the plaintiff is remitted to his first possession, and as if he never had been out of possession, and then, all who occupied in the mean time, by what title soever they came in, shall answer'to him for their time; as if the disseisor had been disseised by another; when the first dis-seisee, re-enters, he shall, in trespass, punish the last dis-seisor, for otherwise, it shall be mischievous unto him, for after his re-entry, he shall have no remedy for the mesne profits; and it is not to be doubted but that the dis-sesee after his re-entry, shall punish the second disseisor, and the servant of the first disseisor who occupied under his master, which was not denied by any. And by the same reason, he shall punish him who comes in by title; for that is now as a trespass done to himself; because after entry he could not have an assise, — that possessory remedy only lying for him who was out of possession, and being also the only possessory remedy at common law, on which the mesne profits could be recovered in damages, the tenant being, in all other cases allowed to retain the intermediate profits of the land to enable him ■ to perform the feudal services, 3 Black. Com. 185-6-7, concurring with Holcombe vs. Rawlyns, is Buller’s N. P. 87, where Mr. J. Buffer says: the reason of the law is with the cases contrary to Lord Coke — of the same opinion is Blackstone,'in his 3 Com. 210,he says: but before entry and actual possession, one cannot maintain an action of trespass, tho’ he hath the freehold in law, and, therefore, an licir before entry, cannot have this action against an abator, tho’ a disseisee might have it against the disseisor for the injury done by the disseisin itself, at which time the plaintiff was seised of the land; but he cannot have it for any act done after the disseisin, until he hath gained the possession by re-entry, and then he may well maintain it for the intermediate damage done; for after his re-entry, the law by a kind of juspost limini, supposes the freehold to have always continued in him.
*366 These defendants, therefore, from the weight of aulho-rity, are not exempted from accounting for mesne profits, by virtue of their character simply, as purchasers, holding the title mediately from the first intermedler with the plaintiff’s rights; having purchased from Outlaw, who purchased from Hickman and Searcy, the purchasers at the Sheriff’s sale.
The next position taken for the defendants, by their counsel is, that they are purchasers without notice of the plaintiff’s claim, at the time of their purchase, — the first notice thereof, being the action of ejectment brought by the plaintiff — and so being purchasers, without' notice, are, in consideration of a court of equity, possessors bona fide, and, therefore, not liable to account for mesne profits, beyond the commencement of the suit. It will be examined; 1st, whether the defendants had notice before suit brought; and, 2d the absence of notice, as imparting or not the character of bona fide possessor against the present claim, being that of an infant.
This we will examine. It is difficult to conceive how this position can be assumed for the defendants, on the present occasion, and made applicable to their case. In the'deraignment of their title, they come in full collision with the title of the plaintiff; and it is impossible to escape it. They purchase from Outlaw, who purchased from Hickman and Searcy, the vendors, who purchased at the execution sale in favor of the said Hickman, this land, as the land of Alexander Nelson of which he was seised in fee simple, at the time of his death, and of which he was the grantee from the State. . The conveyance from Alexander Nelson, the plaintiff’s father and ancestor, is, therefore, a part of the defendant’s title. How, then, can the defendants be said not to have had notice before the action of ejectment. The plea of actual ignorance, in fact, of their own title deeds, and conveyances, and of the claim of plaintiff, appearing by them or appearing by facts and acts to which they point, disclosing notice, will not avail as a subterfuge; such an ignorance is not admissible in law, to rebut the constructive notice given by the title deeds.
*367 Lord Chief Baron Eyre has defined constructive notice to be, “in its nature no more than evidence of notice, the presumption of which is so violent that the court will not allow, even, of its being contradicted. Thus if a gagee has a deed put into his hands, which recites another deed, which shows a title in some other person, the court will presume him to have notice, and will not permit any evidence to disprove it,” Beames Pleas 244. 2 Austr. 438. In Martins vs. Joliffe and others, Amb. 311, it was admitted, that a man is bound to take notice of any thing necessary to make out his title. And in Coppin vs. Fernyhough, 2 Bro. C. C. 291, the mortgagee of a lease which recited a surrender of a former lease in which the plaintiff’s title appeared, was held to have notice oí the title. And in Moore vs. Bennett, 2 Ch. cases 246, cited by Lord Hardwicke, in Martins vs. Joliffe, it is laid down that, “in all cases where the purchaser cannot make out a title but by a deed, which leads him to another fact, the purchaser shall not be a purchaser, without notice of that fact, but shall be presumed cognizant of it; for it is crassa negligentia if he sought not after it.
These cases prove that a purchaser is bound to take notice of every deed necessary to make out his title; and if his title deeds disclose his antagonist’s title, as in Coppin vs. Fernyhough, he is affected with notice of it, and must convey accordingly as was ordered in that case: or, if his title deeds lead to a fact, as in Moore vs. Bennett, he shall be presumed to know that fact. And they prove further, that this, constructive notice, so given by the title deeds, the law will not permit to be contradicted. An application of these principles to the conveyance from Alexander Nelson, the father and ancestor of the plaintiff, will show what notice these defendants had, either actually or potentially, and which makes no difference in its consequences; Beames Pleas 244. A notice, so sufficient is not to be controverted. This conveyance to Hickman and Searcy, the vendees, at the sheriff’s sale, is a conveyance by statute, and is composed of the judgment, the levy and the sheriff’s deed, as essential requisites in *368 its constitution, which the purchaser must see to, and on which he must depend, to effectuate a transfer of the right, either of which, if wanting, renders the conveyance inoperative as to passing the right and title; see. 4, Wheat. 508.
The record of the judgment and decree forming apart of this conveyance, when looked into, will be found to show, either upon its face or by record documents and facts to which it leads, that the judgment and decree are utterly void, and a nullity for want of jurisdiction in the court rendering it; that the plaintiff, Robert Nelson, is the son and heir of Alexander Nelson in the record mentioned, that he was then an infant of tender years, not a party to the suit, and never before the court; that plaintiff Hickman, caused himself to be appointed by the county court of Davidson, administrator of the personal estate of the said A. Nelson, who lived in Georgia, and was a resident there, at the time of his death, having no personal property in this State, at the time of his death or after-wards; and in the character of such administrator and also of creditor, under color of authority, as if conferred by the act of 1789, ch. 39, instituted his suit, to make the land of the plaintiff amenable to the satisfaction of his debt, prosecuted the same to a judgment and decree, and, at an execution sale under the same, became, himself, the purchaser of this tract of 640 acres, for $¡25.
These are the facts, the notice of which this statute Conveyance forming a part of the defendant’s title, gives to them; and they are the facts that must give the character to their possession, as bona fide, which is claimed by them, or otherwise.
Whether or not a bona fide possession is, for the most part, a question of moment upon a bill in equity for mesne profits, the quantum to be recovered being influenced by the nature of the possession, or the quo animo of the possessor, affecting it, not as to the rate of assessment, but as to the time for which it shall be taken. On this question of the account, equity has also, in its view, the situation and conduct of the plaintiff, as giving the principle *369 directory to the time the assessment shall commence. It J _ . r, is to be remarked that at common law lor mesne pronts, either upon the assise, or trespass for mesne profits, the nature of the defendant’s possession, entered not into the consideration of the remedy given to the owner of the soil, whether the occupant and pernor of the fruits and profits was a disseisor originally, or came in by contract under him who] was the original tort feasor, as by feoff ment, lease, or as bailiff or servant, made no difference. The only points for enquiry were, the right of the plaintiff to the land, and the possession of it by the defendant. But, as observed before, in courts of equity, when the plaintiff was compelled to resort to them because his title was equitable, or partly so, they applied, as concomitant with the principle of their interference, and the ground of their jurisdiction, to the points made at law, the equitable circumstances of the case, arising out of the conduct of the parties on both sides, in reference to the subject matter as influencing the relief to .be given on the title for mesne profits. ,
■ A bona fide possession is one of these circumstances, which in common cases, will weigh with the court in limiting the account for rents and profits to the commencement of the suit, and this character of bona fide possession is claimed for these defendants. Are they clothed with it? Lord Hardwicke, in Dormervs. Fortescue, defines it; he says: but where a man shall be said to be bona fide possessed, is where the person possessing is ignorant of all the facts and circumstances relating to his adversary’s title, 3 Atk. 134. It has been shown, that in this case, these defendants were not only not ignorant of all the facts and circumstances relating to the plaintiff’s title; but that they were cognizant of them, and not of some only, which would be sufficient to permit the application of that character, but of all the important facts relating to the title of the plaintiff, and that by means of a superi- or kind, — record evidence. This circumstance of bona fide possession, not existing in the defendant’s case, to contract the account to the filing the bill or the commencement of *370 the ejectment. Another circumstance laid down hy Lord Hardwicke flowing from the plaintiff’s side of the case, as inducing a court of .equity to limit the account of rents and profits to the time of filing the bill, is, when there hath been any default or laches in the plaintiff in not asserting his title sooner, but he lias lain by — then, says, Lord Hardwicke, the court has often thought fit to restrain it to the filing of the bill, 3 Atk. 130. The circumstance of laches here stated by Lord Hardwicke does not apply to infants, but to persons of full age. Littleton sec. 726, says: no laches shall be adjudged to the plaintiffs within age and gives instances. Lord Coke in his comment on this rule, says, in folio 380 b. “and the rule, that no negligence shall be adjudged to an infant, is true, where he is thereby to be barred of his entry in respect of a former right, as by descent (the very case before this court) and herein a diversity is to be observed (says he) between matter of record done or suffered by an infant, and matter in pais, for matter in pais he shall avoid, either within age or at full age as has been said. So that it appears by the common law that the plaintiff was not compelled to enter and bring suit, during his minority, but might, after his full age, no laches being imputable to him. At what time after age his rights were to be asserted at law, depended on the nature of the case, and varied accordingly; but unnecessaryin this suit to be examined further.— The statute law of this State, has, so far as regards action to be brought, interfered with the common law rules governing these rights, and prescribed the time certain actions shall be brought. In the present case, that action at law would be, trespass quare clausum fregit for mesne profits, the time for which, is within three years after coming of age. -
The facts of the present case to which this circumstance is referrible, are, the descent of the land to the plaintiff on the 25th August 179S, being then an infant, of fourteen months old; the decree of the county court of Davidson, July 1801, subjecting the land to sale, and awarding execution for that purpose; the levy on the land, *371 May 1802; and iis being sold under a venditioni exponas, returnable to October 1802. The ejectment was brought 8th July 1819, and the bill filed 15th January 1821.— These facts show, that both the ejectment was brought, and the bill filed within three years after the plaintiff came of age. There is no ground, then, for limiting the plaintiff’s account for mesne profits to the filing of the bill, or the bringing the ejectment, either on the score of ¿aches or the statutable time for the bringing the suit.
But it is argued for the defendants that the statute of limitations protects them against that part of the plain-tilPs claim which is antecedent to three years, next preceding the commencement of the action of ejectment, from which time the account should be taken against them. To this there are several answers: first, it would be depriving him of that protection with which the law, in its wisdom, hath clothed infancy, from the earliest time down to the present, shielding its imbecility against the rapacity of the violent, and its farther advanced, but still immature years, from the more dangerous and destructive machinations of the unprincipled and fraudulent. 2. It would be, to conflict, in direct hostility with that rule of law which says: that laches shall not be adjudged, in an infant: — and 3d,.it would be repugnant to the course of equity decision on bills for mesne profits of land, brought by infants, where the account is always decreed from the time the infant’s title accrued. The same high authority before quoted, Lord Hardwicke, has laid down the law on this point: he says, in 3 Atk. 130, “in the case of a bill brought by an infant to have possession of the estate, and an account of rents and profits, the court will decree an account from the time the infant’s title accrued.” Many other cases are to the same effect, both old and recent. In 1705, in the case of Tilley vs. Bridges, Lord Keeper Wright was of opinion, that where a person has a title to the possession of land, and makes an entry whereby he becomes entitled to recover damages at law for the time the possession was detained from him — after such entry, he should not turn the action at law into a *372 in equity, and bring a bill for an account of profits, except in case of an infant, 2 Eq. Gas. 588, ch. 1. So, in the case of the Duke of Boston vs.-in 1719, where a decree was made for defendant to account for mesne profits during his possession from the time plaintiff’s title accrued, Lord Mansfield observed the decree would be the same, when any fraud had been used to conceal the title from the lessee, or in case of an infant, same book 588, ch. 2.
In Bennett vs. Whitehead 1731. If a third person enters on the land of an infant, the infant, when he comes of age, shall, by a bill in equity, recover the profits from the time of the first entry, 2Pr. Wms. 645. 2 Eq. Cas. ch.,4. So in the late case of Pettiwood vs. Prescott, 7 Ves. 541, where the account for mesne profits was sought from the accruing of the title; the defendants insisted that the account must be confined to six years at most. The master of the rolls, Sir Wm. Grant, in' delivering his judgment said: “there ought to be no account beyond the filing of the bill; there is no infant, no breach of trust in the case” — plainly intimating, that as there was no infancy^ or no breach of trust, the time rested with his discretion on the circumstances, an alteration in the time the plaintiff’s title accrued, which alternative the law of a court of equity would not have permitted in the case of an infancy,.
I will now notice a great mistake in the argument for the defendants in this cause: it is contended for them, that as the plaintiff’s title is a purely legal title, by descent from his father and ancestor, A. Nelson, he has a remedy at law for the mesne profits, and that if his bill had been demurred to, it would have been dismissed.— This position is wholly gratuitous; unsupported either upon principle or authority, it has been overlooked by them, that courts of equity have a concurrent jurisdiction with courts of law in cases of account. The chancellor, in the case of the corporation of Carlisle against Wilson, 13 Ves. 276, where this was the point in the cause by a demurrer to the relief, upon a bill for account, tho’ a *373 legal title — the chancellor says: s*It cannot be ed, that this court interferes only, when no remedy can he had at law — the contrary is notorious.” The same species of relief is given at law in the action of account, as under a hill in this court; hut the great advantage of the latter and the difficulty and delay where the account comes before the auditors, has brought this action into disuse, as is observed by Lord Hardwicke in 2 Yes. 388; the chancellor proceeding, says: “thfe proposition asserted against this bill, is that this court ought to refuse to interfere by directing an account, if an action for money had and received, or indebitatus assumpsit can be maintained. That proposition cannot be supported. In Lewis vs. Sutton, 5 Ves. 683, 687, says he, “the chancellor’s doubt was, not whether an account should be decreed, but whether the plaintiff could recover at law.”— The chancellor, after citing and observing upon some more cases, says, “which, upon those cases must be considered established, a concurrent jurisdiction with a court of law upon the subject of account,” 13 Ves. 276. And Mad. dock’s in his chancery practice, 1 vol. 70, lays it down, that in general, where -the party cannot recover at law, a bill for an account is not sustainable.
These authorities show the jurisdiction of the courts, on the subject of account in cases in general, applicable to adults, as well as infants, and to other cases as to mesne profits. I shall next cite some cases, where mesne profits of land and infants are noticed, particularly. And it will be found that every stranger who intrudes upon the infant’s land, may be charged in account as guardian or bailiff. Thus in the case of Newberg vs. Bickerstaff, in the year 1684, 1 Vern. n. 95. 1 Eq. Cas. 280, the Lord Keeper observed, that Lyttleton says, if a man intrudes upon an infant, he shall receive the profits but as guardian, and the infant shall have an account against him in this court, as guardian.
In Blunden vs. Baugh 9 Car. 1. Cro. Car. 306, Á. D. 1633, it was ruled, that where one enters, claims as guardian and occupies, the infant may consider him either a *374 disseisor or accomptant, which shall be for his best advantage. Lord Coke in his comment on Lyt. sec. 124,' Co. Lyt. 89,90, says: if a stranger enter into tlie lands of an infant within age of 14 years and taketh the profits of the- same, the infant may charge him as guardian in socage, and to a quere of the text, whether he could be charged in like manner after 14,he, Coke, answers: “itis evident that after 14, he shall be charged, as bailiff at any time the heir will, either before his age of 21 years or after.
The chancellor, in Carey vs. Bertie, A. D. 1697, 2 Vern 342, says: if a stranger enters and receives the profits of an infant’s estate, he shall in the consideration of this court, be looked upon as the trustee for the infant. Thus we see, that from the earliest times it was settled law that for every intrusion upon the estate of an infant, an account was given for the mesne profits; waiving the wrong and its remedy at law, as such, he might consider the actor as his guardian, bailiff or trustee, and in such capacity, call upon him in chancery for redress. So it was held in the time of Lyttleton, who flourished about the middle of the 15th century — and from that time, down to the present day. The right to have the account taken in equity, is not grounded on the circumstances of a discovery afforded there, the want of a legal title, the de-vclopement of a fraud &c. but purely because an infant; this being the single, substantive ground, and disconnected with any other: as, for instance, heir; it is true these two characters are often combined in the same person; but when that case exists, the privilege attaches, not quasi heir, but quia infant. The heir cannot claim an account in equity as heir, not stating any impediment to his recovery at law, as that the defendant has the title deeds necessary to maintain his title; that terms are in the way of his recovery atlaw, or other legal impediments which do, or may probably, prevent it, upon which probability, or upon the fact, the court founds its jurisdiction. See the case of Pultncy vs. Warren, where the grounds of jurisdiction in equity upon a bill for mesne profits, are *375 ably discussed by Lord Eldon. He there says: “Bills by infants haye gone upon the grounds of infancy, and the character in which the other party was considered to stand, as a bailiff or receiver, 6 Ves. 73. Ham. Dig. 205, (4) mesne profits ch. 4.
From this view that part of the Chancellor’s decree is wrong, which confines the account for mesne profits to the bringing the action-of ejectment in 1818, instead of extending it to the commencement of the defendant’s possession, and receipt of the fruits and profits in 1812. It must, therefore, be reformed and an account of the rents and profits taken from the commencement of the defendant’s possession, down to the present time, if the receipts of the rents and profits, have so long continued; and if not so continued, down to the cesser of that receipt.
It has already been observed that the remedy for mesne profits by an infant, is not confined to a suit brought by him before the expiration of his infancy, but may be brought after he comes of age, and the account will be taken inclusive of the mesne profits, also, received by the defendants after that time. In support of this, and as a precedent for the proposed correction of the chancellor’s decree in this cause, I will cite one more case in equity in point, embracing fully, the subject herein examined, and authorizing the above correction, as the proper result of law in this cause, gee 2 Eq. Gas.. 589, ch. 4. If a third person enters on the land of an infant, the infant when he comes oí age, shall, by a bill in equity, recover the profits from the time of the first entry; because, where one enters on an infant, he is chargeable as a bailiff or guardian, and no laches shall be imputed toan infant. Admitted in argument 1731, in Bennet vs. Whitehead, 2 Pr. Wms. 645, and in 1 Eq. Gas. 7 ch. 10. If a man, during a person’s infancy receives the profits of an estate, to which the infant is entitled, and continues to do so for several years after the infant comes of age, before any entry is made upon him; yet he shall account for the profits, throughout and not during infancy. 1699. Yal- ■ sop and Ilolworlhy, 1 Har. ch. pr. 198.
*376 The other questions in this case concerning tile im-provemeuts, the value of them, and the liability of the plaintiff to discharge them, is a question of some importance; not so much, in respect to the parties in the present suit, but as it regards society in general, which under the operation of our acts of Assembly concerning occupancy, may, by possibility, affect the rights and interests of a number of our citizens.
It is here to be premised that this question is not res in-tegra — it comes not before us now for the first time — it has undergone a very minute, learned and able examination by this court, and received a solemn decision. As far as it is affected by our acts of Assembly of 1797, ch. 43, sec. 3, 1805, ch. 42, and 1809, ch. 31, sec. 11, it has been discussed and passed upon by the case of Townsend vs. Ships’ heirs, in this court in the year 1813. And the subsequent case of Bristoe vs. Evans and M’Campbell in May 1815 — also, this court has passed’ upon the act of 1813, ch. 24, sec. 1, and settled its effect on the question.
Whatever might be my own opinion upon this question, not to assent to its settlement now, after two solemn decisions of this'court, the last made upwards of 14 years ago, and not only no opposing decision, but no attempt, even by any case, during all this time, to call the point again into controversy, forming a complete acquiescence, would be, at the least inconsistent, perhaps, mischievous, and uncalled for by a correct discharge of officicial duty. Much respect has always been paid to the cotemporaneous construction of statutes, and a forbidding caution hath always accompanied any approach towards unsettling it, dictated, no doubt, by easily foreseen consequences attending the sudden change of a rule of property, necessarily introductory, at the least, of confusion, increased litigation and the disturbance of the.peace of society.— The most able judges, and the greatest names on the bench have held this view of the subject, and occasionally expressed themselves to that effect, either tacitly or openly, intimating, that if they had held a part in the first construction, they would have been of a different opinion 5 *377 Rut the construction having been made, they give their assent thereto. Thus Lord Ellenborough, in 2 East 302, remarks: “1 think it is better to abide by that determination, than to introduce uncertainty into this branch of the law, it being often, more important to have the rule settled, than to dertermine what it shall be. I am not, however, convinced by the reasoning of this case* and if the point -were new, I should think otherwise.” Lord Mans, in 1 Burrow 419, says: “whensolemn determinations, acquiesced under, had settled precise cases, and a rule of property, they ought, for the sake of certainty, to be observed, as if they had, originally, formedapart of the text of the statute. ” And, Sir James Mansfield in 4 Bos. and Pul. 69, says: “I do not know how to distinguish this from the case before decided in the court. It is of greater consequence that the law should be as uniform as possible, than that the equitable claim of an individual should be attended to.”
Having seen what respect ought tobe paid to the above cases, of Townsend vs. Ship’s heirs, and Bristoe vs. Evans and M’Campbell, as the decisions of this court upon coj temporary statutes,! shall nexf briefly state the substance of them, that it may appear how far, from similarity of case or facts and the law, adjudged as arising thereon, or resulting therefrom, by the decision, they will bear upon and influence the decision of the present question.
In the first case, the appellant, Townsend,in August, 1806, settled on a’piece of vacant land, and had it surveyed the 6th August, 1807, with a view to appropriate it by right of occupancy. On the 3d March, 1809, he applied a warrant and made an entry for 300 acres, including his improvement, and next day, procured a grant. He made improvements and resided thereon , from his settlement, to 1812. The ancestor of the appellees, on the 8th of August, 1807, entered 532 acres, including all the improvements, then and afterwards, made by the appellant, and on the 4th December, 1818, obtained a grant. In October, 1808, he brought an ejectment, recovered the possession from the appellant, who surrendered the improvement in *378 1812. The appellant then brought this suit to recover the value of the improvements. Verdict and judgment against him in the circuit court and appeal, and the court affirmed the judgment of the circuit court. The court, in delivering their opinion, amongst other reasons, saj : ‘‘the idea of property, so dear to free men, would be, at once, lost, if it can be controlled by others without the owner’s approbation. Therefore, at common law, a person who cleared or improved another’s land, without his consent or request, was not only entitled to no compensation, but was liable to an action of trespass; though, it is believed, that on the principles, governing a court of equity, that court would directly sustain an action for the value of improvements. At this day it would be time mis-spent to descant at length upon the principles of the constitution under which we live. Let it suffice to observe, that they secure to the honest and industrious, the exclusive enjoy-mentof the fruits of that honesty and industry: and, in other words, the undisturbed use of their property. No man can be deprived of it but by his own consent, unless for the public use: and not then, without just compensation. These principles, being inseparably interwoven in the frame and texture of our constitution, cannot be destroyed by a legislative act.”
The other case of Bristoe vs. Evans and M’Campbell was an ejectment brought by the defendants in error vs. the plaintiff to which he pleaded the general issue and the act of 1813, ch. 24, gave notice of his claim for improvement, and defendants gave notice of claim for mesne profits. The defendants on the trial produced a grant from the State of North-Carolina, dated 1793, and conveyances under it for title. The plaintiff, a grant from the State of Tennesse, dated 1808, and conveyance under it. Verdict for defendant in e-rror, and nominal damages, and judgment and appeal. There was a question raised on the trial respecting the admission of evidence of improvements, the rejection of which was assigned for error, but unnecessary to be stated, particularly as the construction of the act of 1813, ch. 24, forms the important point of the decision.
*379 The opinion amongst other things states, that the legislature are under the same obligation to observe the provisions of the constitution, that is incumbent on this court; if a legislative act should be plainly and obviously opposed to the constitution, the judiciary are incapable of observing the injunctions of the law and the constitution at the same time; one or the other must be dropped; and as the constitution is paramount to any law, the legislature can. make none m opposition to it, the court is left without any alternative. All the organs of government are bound by the constitution — it is the letter of attorney or authority under which all must act. So far as that authority is exceeded, the act is void. With these impressions the act of 1813, will be examined. The 20th sec. of the Bill of Rights, says: “that no law, impairing the obligation of contracts, shall be made.” A grant from the State is a contract between the State and the grantee, G Cranch. 136, 7. It is a contract, executed, and it contains obligations binding on the parties” — then for any legislative act that impairs the obligation arising from the grant, (that the grantee shall have the exclusive use, and enjoyment of the property granted, subject to the limitations before mentioned, (to wit) of such taxes and burdens as had been customary for the good of society, before the formation of the constitution,) is unconstitutional and void. By this principle the act of 1813, will be tested. The idea that the state authorises a man to make an entry in the surveyor’s book, for the land of another; to make extensive improvements on the land; and, under these circumstances, sustain an action for the value of the improvements, is subversive of the clearest principles of natural right, in relation to property, and, consequently, of the constitution, which guarranties to every man the exclusive use of his own property. The authority of the case of Ship’s heirs is decisive on this ground. The owner of property has a right to make such disposition of it as he thinks proper. It may be more to his advantage to suffer it to remain covered with timber than to clear and cultivate it.” The judgment of the circuit court was affirmed.
*380 These are the reasons and grounds of the decision in these two cases. The opinions are delivered atconsiderable length and are very able. It is to be noticed that they also contain positions and sentiments, (I allude to— the allowance of the value of improvements by our courts of equity,) which are not altogether reconcileable with the decisions and the correct principles above extracted and quoted on which the decisions are bottomed and well supported. Having no doubt in the references made to the civil law writers, inadvertently considered, their views and reasonings on the subject of improvements founded on the civil law, as either adopted into our system of equity, or as proper to be so, overlooking the .important fact that they are not authors in our law, but are, according to the expression of Saunders, Chief Baron, who cited Bracton, says the hook, not as an author in our law, ior he said that Bracton and Clanville were not authors in our law, hut he said he cited them as an“s6*qg;ment to discourse, when he agrees with the law, Plowd. 3 purport, says Plowden, was Catline, Chief Justice of England, who cited the words of Bracton; but he said he did not cite him as an author in our law, but for conso-nancy and order, when he agrees with better authorities, Plowd. 359. I rely on the judgment of these eminent lawyers, in the time of Elizabeth, and its application to Lord Raimes and Popinian, whom he cites.
According with the principles and satisfied with the reasons relative to the claim for improvements introduced by our act of Assembly, so ably and convincingly set forth in the above two cases, I will now, as succinctly as possi hie, examine this claim in respect to its basis, as resting, either upon the authorities of the common law, or on the judgments and decisions of our courts of equity.
At the common law, Althams’ case, 8 Co. 148, shows the rights and extent of interest of the owner in his land. Lefford’s case, 11 Coke 46; the redress and its extent against intermedlers with these rights. And Coulter’s case 5 Co. 30, the rights of the intermedler by virtue oí his interference and acts done by him in relation to the *381 land. By AUham?s case the owner of land hath the jus recuperandi, that is, prosequendi jus intrandi, jus habendi, jus retinendi,jus percipiendi ei jus repidenduin other words, the sole and complete-interest, dominion and power, in and over it, exclusive of all other persons, whatsoever. To the same effect is Plowden 488, Nichols vs. Nichols. On the 2 point Lifford’s case shows that the re-entry of the owner after a disseisin, re-vests the property in him of all the fruits and profits of the land, whether natural or fictitious, obtained by the possessor, whether he he the dissei-sor himself, his bailiff, servant, feoffee, lessee or disseisor of the first disseisor; and he, the owner, may sever these fruits, whether industrial, as corn, or natural, as trees; and if cut and carried off the land and sold to^another, he may take them wherever they are carried to; for the reentry has relation to the property to continue the freehold against them in the owner, ab initio, and the carrying them out of the land cannot alter the property. And if the disseisee or owner take them, they shall be recouped in damages against the disseisor. The doctrine in this case, that the disseisee can maintain trespass, only, against the disseisor is overruled by the case of Holcombe vs. Rawlyns, Cro. Eliz. 540, where it is laid down — by the re-entry of the disseisee he is remitted to his first possession, and as if he never had been out of possession, and then, all who occupied in the mean time, by what title soever they came in, shall answer unto him for the same. And sois 3 Black. Com. 210, and Bul. N. P. 87; as to the 3 point Coulter’s case — it is laid down; the disseisor shall recoupeallin damages which he hath expended in amending the houses. This is the only instance found in the books, where disseisor by any act oí his, done upon the land, during his occupancy by virtue of the disseisin, can make a charge against the disseisee, and recoupe the damages to he recovered by the disseisee. The same hook, states divers cases, where one is in by his own wrong, shall recoupe and retain against the disseisee, as in the case of rents, (but they rest on different grounds) for, says the book, the reason in such case of the recouper is, he- *382 cause otherwise, "when the disseisee re-enters the damages of the rent service, charge or seek would be recovered. And therefore, to avoid circuity of action, against the disseisee, the arrearages during the disseisin shall be recouped in damages. These cases are very different from the claim for improvements. The rents accrue by contract, prior to the disseisin, wholly, independent of it and unconnected with it. The improvements, by the dis-seisor or intermedler originate not in contract, but in tort, after the disseisin in virtue of it and dependant upon it for their existence. The claim for them therefore, is founded wholly upon unlawful acts. The supreme court of the United States, in Green vs. Biddle, recognize the law as laid down in Coulter’s case, that the disseisor, upon a recovery against him, may recoupe the damages to the value of all he has expended, in amending the houses, and observe, that if any common law decision has ever gone beyond the principle, there laid down, they have not been fortunate enough to meet with it. The case of Green vs. Biddle, I consider an irresistibly strong authority in the present case, from the deservedly high character of the court, its unquestionable talent, the able, learned and particular investigation of the subject, and that subject the same as the one now before this court— the claim for improvements not originating to be sure under the act of Assembly of the State of Tennessee, but under the act of Assembly of a sister State, Kentucky, the principle and object of both States being the same, the difference being only in modification.
It would be wholly superfluous to state the'provi,sions of an act of Assembly respecting improvements here, to mark their inroads upon the established rights of private property; their utter prostration of all our legal principles on the subject, and their open and violent transgression of our constitution, these positions being well known to all. I shall therefore content myself with quoting from what is said by the supreme court of the United States, in Biddle vs. Green on this point: “Nothing in short (they say) can be more clear upon principles of *383 law and reason, than that a law. which denies to the owner of land, a remedy to recover the possession of it, when witheld by any person, however innocently he may have obtained it; or to recover the profits received from it by the occupant, or which clogs the recovery of such possession and profits by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to and interest in the property. If the remedy afforded, to recover the possession, be qualified and restrained by conditions of any kind, the right of the owner may, indeed, subsist and be acknowledged, but is impaired and rendered insecure, according to the nature and extent of such restrictions. A right to land essentially implies a right to the profits accruing from it, since without the latter, the former can be of no value. Thus a devise of the profits of the land, or,- even a grant of them, will pass a right to the land itself, Shepard’s Touch 93, Coke’s Lyt. 4, G, for, what (says Lord Coke in this page) is the land but the profits thereof. 8 Wheat. 75-6.
It only remains for me to notice whether equity has recognized this claim for improvements, given by these acts of Assembly. The ■ argument has adverted to the civil law on this point and detailed its various reasoning on the question, and then has said, that it is competent for the legislature to change the former, and give that remedy at law upon ejectment, or trespass, which was afforded upon bill in equity. This argument is begging the question. It is admitted the legislature may change the former; but it is altogether an unfounded assumption, that equity has sustained a bill for the claim of improvements by the occupant, whether he be the original intermedler or claimant by title under him with or without notice. No case has been cited showing such a precedent, nor have I been able to find one. As we have seen neither the law or the principles of law give such a right, it is difficult to perceive how equity could give it, for equitas sequitur legem. In the court of chancery in England, and by the act of 1782, ch. II, our courts of equity possess all the powers and authorities which the court of chancery possessed *384 under the colonial government, being the same as in England; there Lord Ilardwicke says, 3 Atk. 130, where a man brings his bill in this court, where there is a trust and a more equitable title, — there, he shall recover the estate, and the court will give him an account of the rents and profits, and that from the time the title accrued, unless under special circumstances; and then they will restrain to the time of bringing the bill; as where the defendant had no notice of the plaintiff’s title, nor had the deeds and writings in his custody in which the plaintiff’s title appeared, or when the plaintiff’s title appeai’-ed by deeds in a stranger’s custody: — in all which cases, and others similar (to them in principle, the account is confined to the time of filing the bill. In the case of an infant plaintiff, he says, nothing can be clearer, both in law and equity and from natural justice, than that the plaintiff is entitled to the rents and profits, from the time the title accrued. Such is the rule in courts of equity, and it recognizes the plaintiff’s title only, not that of the defendant or occupant. It considers the defendant or occupant as having none by his possession or occupancy, and perception of the fruits and profits, it is not once noticed as an existence or as giving a right, or color of right. The plaintiff’s case is only looked to. Is it his land,his estate? if so, an account of rents and profits is decreed to him, oí course, as the consequence of property. The time from which the account shall be taken is influenced in some special cases by circumstances, affecting the plaintiff’s recovery by diminution in its quantity, operating in favor of the defendant, of course, not by way of meritorious claim from the nature of his possession, but by subtraction from the plaintiff' for neglect or default.
From this view of the principles of the common law and those directing courts of equity, and the adjudications upon them, as well as the decided cases in this court above referred to, and in the supreme court of the United States, and by, and under, the authority of the 20th sec. of the 11th article of our constitution, lam compel *385 led to say, that our acts of Assembly, mentioned respecting improvements, are unconstitutional, and to concur with the court last mentioned when they say, that the duty, not less than the power of this court, as well as of every other in the Union, to declare a law unconstitutional which impairs the obligation of contracts, whoever may be the parties to them, is too clearly enjoined by the constitution itself, and too firmly established by the decisions of this and other courts to be now shaken.” And that those decisions entirely cover the present case.
I have given my opinion upon the questipn of improvements, under our acts of Assembly in the present case, not because of the allowance of the value of them by the decree, and the amount of the value of them exceeding the rents and profits as per account taken by the master; for I consider the objection against them foreclosed by the plaintiff, by his offer in his bill to settle them with the defendants if they would account with him for the rents and profits from the time they entered into possession; and to pay them any balance that might be due on the account. But because of other parts of the decree affected by the same principles that govern improvements, which will be noticed presently, and also, because the argument called in question the correctness of the decisions in this court of Townsend vs. Ship’s heirs and Bristoe vs. Evans and M’Campbell — thereby rendering it necessary for me to give an opinion on the subject. The decree is also erroneous in ordering the writ of possession to issue upon a condition in delay of the plaintiff’s right. It is further erroneous in allowing, in favor of the plaintiff, only so much of the master’s account of rents and profits, as is comprised within the years 1818, ’19, ’20 and ’21. Let the cause be, therefore, remanded to the court of chancery, with directions to allowjhe master’s report from the year 1812, — the time of the commencement of the defendants’ possession; and instead of stopping the same, at the year --to continue it down to the time the account shall be so rectified in the court of chancery; or until the cesser of the receipt of the fruits and profits fey *388 'dantin error. As respects the jurisdiction of the justice of the peace, issuing the attachment, for the issuing and levy of which this suit of trespass is brought, it is laid down in Coke thus: “When a court has not jurisdiction,» the'party, the officer and all assisting are trespassers/’— This is a leading case, and its doctrine has been followed ever since. A recent recognition of it by the supreme court of the United States is to be found in Crunch.— The jurisdiction of a justice of the peace in issuing attachments, is a limited and special jurisdiction, founded upon act of Assembly, giving the power which cannot be transgressed by him. It is not only limited as to the amount of value of the subject matter of litigation in those cases where he is the court, and the attachment returnable and triable before himself, or some other justice of the peace; but it is also limited’as to the action of the claim, and the party defendant against whom the attachment issues, requiring a jurisdiction over the person.
This will plainly appear upon reference to the act creating the authority. Act of 1794, ch. 1, sec. 56, it says, “that any one justice of the peace in cases where, by this act, he has jurisdiction, may issue an original attachment against the estate of any absconding or absent debtor &c. directed to the sheriff or any constable of the county” &c. Now this language plainly shews, that the legislature never contemplated a jurisdiction beyond the limits of the county of which the issuing magistrate was a justice of the peace; or that the effects or property of any description, of the resident- citizen of another county should be affected by its exercise. This exercise of the. office and duties of a justice of the peace is local in its nature, circumscribed by the lines of the county, and confined to its limits; when he passes those bounds, he leaves his official capacity behind him, and only re-assumes it again upon his re-gress into his county. Out of his county he is as completely disrobed of his authority as if he had never been clothed with it, and there is no pretence for saying that he is a justice of the peace for the State. His commission shews the restriction, and also the consti *389 tution, which in the 5th article and 12th sec. sajrs, “there shall be justices of the peace appointed for each county.” His process, of course, is as limited as his authority, and its extent measured by the same bounds. The act says, “he may issue an attachment against the estate of any absconding or absent debtor.” The idea of the estate and its owner, the absconding or absent debtor, are inseparably connected; and the owner must be an absconding or absent debtor. This local jurisdiction attaches upon residence as a separate, and inviolate jurisdiction, for many purposes, and indeed, for all purposes coming within the purview of the official duties of a justice of the peace, one of which is, the issuing of original attachments and his cognisance of the cause originated thereby. Thus we see, that this jurisdiction is purely local, in reference to the justice of the peace, in reference to his issuing the original attachment, in reference to the residence of the absconding or absent debtor, in reference to his estate, and in reference to the officer executing the process; all must be, exist, or act, within the body of the county, from the very nature of the case. What is a county in our political association? It is a political community formed by the constitution and acts of Assembly,having its rights, its duties, its obligations, its privileges, its officers, civil, military, judicial and ministerial; — the field of the action of all, which is local, and limited to the confines of the county. These rights, duties, offices, &c. are exerciseable in the county by the body politic, or community composing the county, exclusive of the agency of the officers &c. of any, and every other like community or county. This organization is general, and applies to every county in the State. No occasion, therefore, can either of right or necessity, occur for the agency or for the official services &c. of any other officer of any county. This political construction of the limits at once shews the true meaning of the legislature in the 56th section, where it says, “may issue an attachment against the estate of an absconding or absent debtor,” that it must be an absconding or absent debtor from the county where the *390 original attachment, the officer, the estate and the resi-qcnce 0f sllc]1 debtor were located; neither reason or ne-ccssity require it to he otherwise, as eyery county is equal-provided by its construction to meet the case wherein it may occur. This view of the jurisdiction of a justice of the peace upon original attachments, is in unison with the cases of Cleon Moore vs. Smith, in error, at Rogersville; and of Chambers vs. Haly and Edington at Sparta; Peck’s Reports 159, 161. It is the view that, to my understanding, has always been held by this court since I have been a member of it. It would be drawing out this opinion to too great a length to notice the evils that would inevitably flow from a discordant construction of the act of Assembly: Suffice it here to sajr, and it must he at once perceived, that incalculable mischief, based upon fraud and perjury, would be the certain consequence.
Let the judgment of the circuit court be affirmed.